RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
MATTHEW HOFFMAN, SBN 227351
  mhoffman@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
DANIEL R. ADLER, SBN 306924
  dadler@gibsondunn.com
KENNETH H. OSHITA, SBN 317106
  koshita@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

Attorneys for Plaintiff LEXINGTON
INSURANCE COMPANY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>MARTIN A. MUELLER, in his official capacity as Judge for the Cabazon Reservation Court; MATTHEW L.M. FLETCHER, in his official capacity as Judge of the Cabazon Reservation Court of Appeals; ALEX SKIBINE, in his official capacity as Judge of the Cabazon Reservation Court of Appeals; KEVIN K. WASHBURN, in his official capacity as Judge of the Cabazon Reservation Court of Appeals,<br><br>Defendants. | CASE NO.  5:22-CV-00015<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Gibson, Dunn &
Crutcher LLP

## I.   INTRODUCTION

1.     Indian tribes exist in the United States as "distinct, independent political communities" with necessarily *limited* sovereign powers.  *Plains Commerce Bank v. Long Family and Cattle Co.*, 554 U.S. 316, 327 (2008).  The sovereignty they wield centers only "on the land held by the tribe and on tribal members" and does not, as a general matter, extend to "non-Indians who come within their borders."  *Id.*  If a tribe imposes its authority on nonmembers beyond the limits of tribal jurisdiction, particularly over nonmembers who have not entered tribal land or done anything to affect tribal self-government or internal relations, federal courts are empowered to declare the tribe's exercise of jurisdiction unlawful and enjoin it.

2.     Plaintiff Lexington Insurance Company urgently requests such declaratory and injunctive relief against the judicial officials of the Cabazon Band of Mission Indians (the "Tribe"), who continue to subject Lexington to the unlawful jurisdiction of the Tribe and its tribal court, the Cabazon Reservation Court (the "Tribal Court").  Without this Court's intervention, Lexington is and imminently will be subject to the orders and judgments of a court that lacks authority over it.

3.     This case arises from an insurance dispute.  The Tribe owns and operates the Fantasy Springs Resort Casino, located on tribal trust lands in Indio, California.  In March 2020, like countless other businesses and business owners across the country, the Tribe suspended non-essential operations and closed the casino to slow the spread of COVID-19 throughout their community.  The resulting pause in commercial activity allegedly resulted in financial losses to the Tribe, and it in turn sought "business interruption" coverage under its property insurance policy.  Lexington, as the primary insurer for the Tribe, investigated the Tribe's claims, and determined that there was no coverage under the insurance policy because the Tribe had provided no evidence of "direct physical loss or damage" to insured property—a requisite for coverage under the policy.  Lexington denied coverage, and the Tribe filed a lawsuit against Lexington for

declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing.

4.     Hundreds of similar COVID-19 related lawsuits have been filed by policyholders throughout the country, and insurers have prevailed in the overwhelming majority of those cases, including the only cases decided so far by state and federal appellate courts.  As one court in this District held, a "consensus" has formed that "where an insurance policy preconditions coverage on a 'direct physical loss of or damage to' property, economic business impairments caused by COVID-19 and related safety orders do not fall within the scope of coverage."  *Ragged Point Inn v. State Nat'l Ins. Co.*, 2021 WL 4391208, at *4 (C.D. Cal. Sept. 24, 2021).  Similarly, the Ninth Circuit has held that mere loss of use is insufficient to trigger coverage where a property insurance policy requires "direct physical loss of or damage to" property, as "intangible," "incorporeal," or "economic" losses are distinguishable from "physical" ones.  *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 892 (9th Cir. 2021).  Every other federal court of appeals to address the question has answered it the same way.  *See Goodwill Indus. of Cent. Oka., Inc. v. Phil. Indem. Ins. Co.*, — F.4th —, 2021 WL 6048858 (10th Cir. 2021); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, — F.4th —, 2021 WL 5833525 (7th Cir. 2021); *Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398 (6th Cir. 2021); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141 (8th Cir. 2021); *Gilreath Family & Cosmetic Dentistry, Inc. v. Cincinnati Ins. Co.*, — F. App'x —, 2021 WL 3870697 (11th Cir. 2021).  And in a decision that, like *Mudpie*, applied California law, the California Court of Appeal confirmed that the "mere loss of use of physical property to generate income, without any other physical impact to property" does not constitute direct physical loss.  *Inns by the Sea v. Cal. Mut. Ins. Co.*, 71 Cal. App. 5th 688 (2021).

5.     The questions of insurance law presented by the Tribe's suit against Lexington are no different from those presented by the hundreds upon hundreds of cases that have been dismissed by federal and state courts.  *See* University of Pennsylvania

Law School, Covid Coverage Litigation Tracker, Trial Court Rulings on the Merits in Business Interruption Cases, https://cclt.law.upenn.edu/judicial-rulings/ (last visited Dec. 1, 2021). This case is different from those cases only because of where it was brought: in the Tribe's own tribal court.

6. The Tribe filed suit there in an effort to find a friendlier forum for its claims—which would likely be dismissed if filed in state or federal court.

7. As a general rule, tribes *presumptively* lack adjudicatory authority over nonmembers like Lexington. Only in exceptional circumstances may a tribe exercise jurisdiction over a nonmember through its tribal court. The Supreme Court recognizes two exceptions, under *Montana v. United States*, 450 U.S. 554 (1981), and the Ninth Circuit recognizes a third, under the right-to-exclude doctrine.

8. The *Montana* exceptions authorize the exercise of tribal jurisdiction by a tribal court when (1) the nonmember's conduct arises from a consensual relationship with the tribe or its members, or (2) the nonmember's conduct imperils the tribe's health, welfare, or political or economic wellbeing. 450 U.S. at 565–66. In either case, however, the exercise of tribal jurisdiction must be based on the nonmember's conduct "on the land," within the territorial boundaries of the tribe, and it must be necessary to protect tribal self-government and control internal relations. *Plains Commerce Bank*, 554 U.S. at 334, 336–37.

9. Under the right-to-exclude doctrine, a tribe's sovereign power to exclude nonmembers from its land grants it "the lesser authority to set conditions on their entry through regulations." *Water Wheel Camp Rec. Area, Inc. v. LaRance*, 642 F.3d 802, 804–05 (9th Cir. 2011) (per curiam). But such an exclusionary power cannot apply where nonmembers have not physically entered or engaged in activity on tribal land. *Emp'rs Mut. Cas. Co. v. McPaul*, 804 F. App'x 756, 757 (9th Cir. 2020).

10. These exceptional circumstances do not exist here. Although Lexington contracted with the Tribe to insure its property, contractual relationships alone are not enough to establish tribal jurisdiction. Lexington's contract-based activities—reviewing

1   and determining coverage under the policy issued to the Tribe—have not occurred *on*
2   *the land* held by the Tribe, as Lexington has never entered the Tribe's borders.

3       11.    Instead, Lexington's relevant conduct occurred outside the Tribe's borders
4   in its off-reservation place of business.  The insurance policy itself was issued as part of
5   a nationwide property insurance program administered and maintained by a third party,
6   Alliant Insurance Services, Inc.  The Tribe participates in this program and bought
7   insurance through Alliant, not directly from Lexington.  And Lexington, along with
8   several other insurers, participates in this program through contracts with Alliant and/or
9   wholesale brokers to provide insurance and underwriting services to any members of the
10  program who meet set underwriting standards.  In this case, there was no direct contact
11  between the insurer (Lexington) and the insured (the Tribe) when the insurance policy
12  was negotiated and issued.

13      12.    The Tribe need not adjudicate disputes arising from the insurance policy to
14  protect its self-government or control its internal relations.  Because Lexington is a
15  nonmember whose relevant conduct occurred far from the reservation, regulating its
16  conduct cannot be justified by reference to tribal governance or internal tribal affairs.
17  The Tribe, through its extensive tribal law and order code, regulates many types of
18  reservation activities, such as gaming, land use, construction and development, parades,
19  and taxation of intoxicating beverages and cigarettes.  But insurance is not one of them,
20  undermining any suggestion that the Tribe's exercise of authority over Lexington is
21  necessary to protect the Tribe's sovereign interests.

22      13.    In short, the Tribe has imposed its adjudicatory authority over Lexington
23  based on the mistaken notion that it has jurisdiction over any nonmember it does
24  business with.  But such a view is not only contrary to law, it swallows the general rule
25  against tribal jurisdiction over nonmembers and expands the Tribe's otherwise limited
26  sovereign powers.

27      14.    Lexington has been subjected to the Tribal Court's jurisdiction for over a
28  year.   During this time, Lexington has vigorously contested the Tribal Court's

jurisdiction before the Tribal Court itself, as well as its Court of Appeals, to no avail: The Tribal Court continues to impose its jurisdiction on Lexington.  Lexington was required to engage in these tribal-court proceedings under a federally imposed exhaustion requirement, to provide the Tribe and its tribal court with the opportunity to consider its own jurisdiction before any federal challenge could be brought.  But tribal remedies have now been fully exhausted, and this case is ripe for federal review and intervention.

15.    Because the Tribal Court, through Defendants, continues to exercise jurisdiction over Lexington in violation of federal law and imminently will issue orders and judgments as to Lexington without lawful authority, Lexington has suffered injury in fact that is traceable to Defendants and redressable by this Court.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992); *Plains Commerce Bank*, 554 U.S. at 326.

16.    For these and other reasons alleged herein, Plaintiff Lexington Insurance Company respectfully requests that this Court declare the Cabazon Reservation Court's exercise of jurisdiction over it unlawful and enjoin Defendants, each of whom is a judicial official of the Tribe, from further proceedings involving Lexington before the Cabazon Reservation Court.

## II.    PARTIES

17.    Plaintiff Lexington Insurance Company (referred to previously and throughout as "Lexington") is a Delaware corporation with its principal place of business in Boston Massachusetts.

    a.  Lexington is not a member of the Tribe and does not maintain any operations, offices, employees, or agents within the Cabazon Band of Mission Indians Reservation  (the "Reservation").

    b.  Lexington was sued by the Tribe in the Cabazon Reservation Court (referred to previously and throughout as the "Tribal Court"), in

*Cabazon Band of Mission Indians v. Lexington Ins. Co.*, No. 2020-0103 (the "Tribal Court Action").

    c.   Lexington moved by limited special appearance to dismiss the Tribal Court Action for lack of jurisdiction.  Following the Tribal Court's denial of the motion, Lexington appealed from the decision to the Cabazon Reservation Court of Appeals (the "Tribal Court of Appeals"), in *Cabazon Band of Mission Indians v. Lexington Ins. Co.*, No. CBMI 2020-0103 (the "Tribal Court Appeal").

18.    Defendant Martin A. Mueller is a Judge for the Tribal Court and currently presides over the Tribal Court Action.  He is sued only in his official capacity.  Upon information and belief, Defendant Mueller has authority to terminate the Tribal Court Action against Lexington.  Upon information and belief, Defendant Mueller is a resident of the State of California.

19.    Defendant Matthew L.M. Fletcher is a Judge for the Tribal Court of Appeals and presided over the Tribal Court Appeal.  He is sued only in his official capacity.  Upon information and belief, Defendant Fletcher has authority to terminate the Tribal Court Action against Lexington.  Upon information and belief, Defendant Fletcher is a resident of the State of Michigan.

20.    Defendant Alex Skibine is a Judge for the Tribal Court of Appeals and presided over the Tribal Court Appeal.  He is sued only in his official capacity.  Upon information and belief, Defendant Skibine has authority to terminate the Tribal Court Action against Lexington.  Upon information and belief, Defendant Skibine is a resident of the State of Utah.

21.    Defendant Kevin K. Washburn is a Judge for the Tribal Court of Appeals and presided over the Tribal Court Appeal.  He is sued only in his official capacity.  Upon information and belief, Defendant Washburn has authority to terminate the Tribal Court Action against Lexington.  Upon information and belief, Defendant Washburn is a resident of the State of Iowa.

Gibson, Dunn &
Crutcher LLP

### III.   JURISDICTION, VENUE, AND EXHAUSTION OF TRIBAL REMEDIES

### A.   Jurisdiction

22.   This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331.  Whether the Tribal Court may exercise jurisdiction over nonmember Lexington is an issue arising under federal law and thus presents a federal question. *Plains Commerce Bank*, 554 U.S. at 324.

23.   Lexington has standing to bring this action.  Lexington has suffered "injury in fact" because it has been and continues to be subjected to the Tribal Court's unlawful determination and exercise of jurisdiction over it, and because it has been and imminently will be subject to the Tribal Court's orders and judgments, injuries which are traceable to Defendants and can be redressed by a favorable decision of this Court. *See Lujan*, 504 U.S. at 561–62 (holding that if a plaintiff "is himself an object of" a government's unlawful regulation, there is "little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it"); *Plains Commerce Bank*, 554 U.S. at 326 (holding that a nonmember "was injured by the Tribal Court's exercise of jurisdiction over [a] claim" against it and that "[t]hose injuries can be remedied by a ruling in favor of the [nonmember] that the Tribal Court lacked jurisdiction and that its judgment on the . . . claim is null and void").

24.   Lexington seeks declaratory and injunctive relief under the doctrine established in *Ex Parte Young*, 209 U.S. 123 (1908), which authorizes such suits against state or tribal officials.  Under *Ex Parte Young* and its progeny, this Court has authority to enjoin tribal officials from violating federal law.  *See Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 796 (2014).  Defendants are judges of the Tribal Court or Tribal Court of Appeals and so are officials of the Tribe.  Each Defendant is involved in the Tribal Court's ongoing exercise of jurisdiction over Lexington and in violation of federal law.

25.   Lexington also seeks declaratory and injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202, which

grant this Court authority to declare the rights and legal relations surrounding questions of actual controversy that exist between parties.  A case of actual controversy exists between Lexington and Defendants with respect to the Tribal Court's ongoing exercise of jurisdiction over Lexington in violation of federal law.

**B.      Venue**

26.     Venue is proper within the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district.

**C.      Exhaustion of Tribal Remedies**

27.     Challenges to a tribal court's jurisdiction are subject to an exhaustion requirement.  Before a federal court may consider the question "whether a tribal court has exceeded the lawful limits of its jurisdiction," the tribal court itself must first be given a "full opportunity" to evaluate and determine its own jurisdiction.  *Nat'l Famers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856–57 (1985).  Once "tribal remedies" have been exhausted, a tribal court's determination of its own jurisdiction is subject to review by a federal court.  *Id.* at 853.

28.     To exhaust tribal remedies, "tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts."  *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 17 (1987).  Thus, exhaustion is complete when tribal appellate review is complete.  *Id.*; *see also Elliot v. White Mountain Apache Tribal Court*, 566 F.3d 842, 844 (9th Cir. 2009); *Ford Motor Co. v. Todecheene*, 488 F.3d 1215, 1216–17 (9th Cir. 2007).

29.     Lexington has exhausted all available tribal remedies before the Tribal Court and Tribal Court of Appeals.  Making a limited special appearance, Lexington moved to dismiss the Tribal Court Action for lack of jurisdiction.  The motion was heard and denied by the Tribal Court, and Lexington sought interlocutory appellate review of the Tribal Court's decision.  The Tribal Court of Appeals accepted interlocutory review and affirmed the lower court's decision.  Lexington has therefore exhausted tribal

remedies.  *See, e.g.*, *Big Horn Cty. Elec. Coop., Inc. v. Big Man*, 2018 WL 4603276, at *3 (D. Mont. Sept. 25, 2018) ("In *Elliot* and *Ford Motor Co.*, the Ninth Circuit instructed once the issue of jurisdiction has been decided by the tribal appellate court, a non-Indian has satisfied the exhaustion requirement even if the merits remain to be determined.").

## IV.   BACKGROUND AND PROCEDURAL HISTORY

### A.   The Underlying Insurance Contract

30.   The Cabazon Band of Mission Indians (referred to previously and throughout as the "Tribe") is a federally recognized Indian tribe located in Indio, California, and situated on the Cabazon Indian Reservation (referred to previously and throughout as the "Reservation").

31.   The Tribe is insured through a nationwide property insurance program known as the Tribal Property Insurance Program ("TPIP"), which is part of a larger property insurance program known as the Alliant Property Insurance Program ("APIP") that also insures municipalities, hospitals, and non-profit organizations.

32.   TPIP is maintained and administered by a third-party service called "Tribal First," which is a specialized program of Alliant Specialty Insurance Services, Inc. and/or Alliant Insurance Services, Inc. (collectively, "Tribal First" or "Alliant").  Alliant Specialty Insurance Services, Inc. and Alliance Insurance Services, Inc. are registered California corporations located in Newport Beach, California.  In maintaining and administering TPIP, Alliant processes submissions for insurance; collects premiums; prepares and provides quotes, cover notes, policy documentation and evidences of insurance; and develops and maintains an underwriting file for each insured under TPIP.

33.   Various insurance carriers, including Lexington, participate in APIP (and its subprogram TPIP) by providing insurance and underwriting services at different layers of coverage and varying percentages of risk insured by those layers.  Several of the layers of coverage provided to TPIP insureds are subject to aggregate coverage limits.  As a result, covered losses paid to one insured can reduce the coverage limit available to other insureds during a single policy period.

34.     Through TPIP, the Tribe was issued multiple property insurance policies by the participating carriers for the policy period from July 1, 2019, to July 1, 2020, including but not limited to Lexington Policy No. 017471589/06 (Dec 15) 9105.

35.     The Tribe negotiated and obtained its property insurance policy for the 2019-2020 policy through Alliant, based on underwriting guidelines established between Alliant and TPIP carriers.

36.     The Tribe did not negotiate or obtain its insurance policies for the 2019-2020 policy period directly from Lexington, or any other TPIP carrier.

37.     Lexington, and the other TPIP carriers negotiated and entered into separate and independent contracts with Alliant setting forth each TPIP insurer's obligations under TPIP.

38.     Lexington, and the other TPIP carriers did not have direct contact with potential TPIP insureds, including the Tribe, before the issuance of the property insurance policies for the 2019-2020 policy period.  Lexington and the other TPIP carriers learned of potential TPIP insureds, including the Tribe, only through Alliant. On information and belief, Alliant (not Lexington) processed the Tribe's submissions for insurance; collected premiums from the Tribe; prepared and provided quotes, cover notes, policy documentation and evidence of insurance to the Tribe; and developed and maintained an underwriting file for the Tribe.

39.     Each property insurance policy issued through TPIP to the Tribe for the 2019-2020 policy period incorporates a master policy form referred to as the Tribal First Policy Wording, TPIP USA Form No. 15, which sets forth the terms, conditions, and exclusions of coverage applicable to the Tribe (collectively, the "Policy").

40.     The Policy does not contain any provisions through which Lexington consents to the jurisdiction of the Tribe or its Tribal Court.

41.     The Policy does not contain any provision through which Lexington consents to the laws of the Tribe governing the interpretation of the Policy.

Gibson, Dunn &
Crutcher LLP

11

42.     The Policy contains a "Service of Suit (U.S.A.)" provision, which states, in relevant part, that "Underwriters hereon, at the request of the Named Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States."

43.     The Policy itself does not specifically name the Tribe or any TPIP insured. And the Policy does not specifically name any TPIP carrier, including Lexington.

44.     The Policy states that the "Named Insured" is "shown on the Declaration page, or as listed in the Declaration Schedule Addendum attached to this policy," and that Tribal First (i.e., Alliant) maintains a "Named Insured Schedule" in its files.

45.     Copies of the Policy and other related documents were prepared by Alliant and provided to the Tribe by Alliant (not Lexington).  True and correct copies of the documents provided to the Tribe by Alliant are attached hereto as **Exhibit A.**  Included among those documents is the Declaration page associated with the Lexington property insurance policy issued to the Tribe.  In the Declaration page, the "Named Insured" is identified as "All Entities listed as Named Insureds on file with Alliant Insurance Services, Inc. c/o 325 E. Hillcrest Dr. Suite 250, Thousand Oaks, CA 91360."

46.     Also included among the documents related to the Policy that were prepared and provided by Alliant (not Lexington) to the Tribe was a document entitled "Tribal Property Insurance Program Evidence of Coverage."  The Evidence of Coverage document is printed on "Tribal First Alliant Underwriting Solutions" letterhead and signed by Ray Corbett, Senior Vice President of Alliant Specialty Insurance Services. The document indicates that it was prepared by Alliant "as a matter of convenience" and was "based on facts and representations supplied to [Alliant] by [the Tribe]."  It also

Gibson, Dunn &
Crutcher LLP

12

indicates that any "Notification of Claims" must be sent to "Tribal First" by way of a P.O. Box in San Diego, California.

**B.     The Tribe's COVID-19-Related Insurance Claim**

47.     In March 2020, the Tribe temporarily suspended operations of its casino because of the COVID-19 pandemic.

48.     On March 25, 2020, the Tribe submitted insurance claims under the Policy to Tribal First by email.

49.     Tribal First transmitted the Tribe's insurance claims to Lexington.

50.     All contractual activity by Lexington related to the Policy and the Tribe's claims occurred away from the Reservation and did not occur on land held by the Tribe or within the exterior boundaries of the Reservation.

51.     After receiving the Tribe's insurance claim and investigating it, Lexington issued a letter to the Tribe, dated April 9, 2020, denying coverage.  The letter was prepared, drafted, and emailed by or on behalf of Lexington from outside the territorial boundaries of the Tribe, on non-Reservation and non-tribal land.

52.     On May 12, 2020, the Tribe's coverage counsel wrote to Lexington requesting immediate reconsideration and acceptance of coverage.

53.     On May 27, 2020, Lexington responded to the Tribe's letter, reaffirming denial of the claim.

54.     On November 24, 2020, the Tribe initiated legal proceedings in the Tribal Court against Lexington.

**C.     The Tribal Court Action**

55.     The Tribal Court Action is captioned *Cabazon Band of Mission Indians v. Lexington Ins. Co.*, Case No. 2020-0103.

56.     Defendant Mueller presides over the Tribal Court Action.

57.     In its complaint in the Tribal Court Action, the Tribe brought causes of action for declaratory judgment, breach of contract, and breach of the covenant of good faith and fair dealing (bad faith) against Lexington.

58.     The Tribe's complaint in the Tribal Court Action alleged that the Tribal Court had subject matter jurisdiction over the matter because Lexington "transacted business with Cabazon and entered into a consensual relationship with Cabazon" when it "agree[d] to provide insurance coverage under the Policy, including as to real property located within the Reservation boundaries."  The Tribe also alleged that it "never agreed under the Policy to waive tribal court remedies," and that Lexington "specifically agreed" in the Policy to the Tribal Court's jurisdiction when it agreed to "submit to the jurisdiction of a Court of competent jurisdiction within the United States."

59.     As to personal jurisdiction, the Tribe's complaint in the Tribal Action alleged that the Tribal Court had personal jurisdiction over Lexington because Lexington "agreed to provide insurance services to Cabazon," was "in the business of providing insurance contracts to . . . Indian tribes, such as Cabazon," and because "[Tribal First], as an agent of Lexington, issued the Policy, which is specially designed to meet the needs of Indian tribes, to Cabazon."

60.     On January 19, 2021, Lexington moved to dismiss the Tribal Court action for lack of subject matter and personal jurisdiction under both Cabazon tribal law and federal law.[1]

61.     On March 11, 2021, after briefing and argument, Defendant Mueller, as judge of the Tribal Court Action, issued a written order denying Lexington's motion to dismiss for lack of jurisdiction.

62.     On April 2, 2021, Lexington requested review of the Tribal Court order denying Lexington's motion to dismiss and filed a notice of appeal, which Defendants Washburn, Fletcher, and Skibine, as judges of the Tribal Court of Appeals, granted on May 18, 2021.

---

[1] Lexington also moved to dismiss under the doctrine of *forum non conveniens*.

63.    On April 2, 2021, Lexington moved the Tribal Court to stay the Tribal Court Action pending the Tribal Court of Appeal's determination as to Lexington's notice of appeal, and the determination of the Tribal Court Appeal.

64.    On April 20, 2021, the Tribal Court issued a minute order granting Lexington's motion and stayed the Tribal Court Action.

65.    On November 12, 2021, after briefing and argument, Defendants Washburn, Fletcher, and Skibine, as judges of the Tribal Court of Appeals, issued a written decision affirming the Tribal Court's denial of Lexington's motion to dismiss for lack of jurisdiction.  A true and correct copy of the Tribal Court of Appeals' written decision is attached hereto as **Exhibit B**.

66.    On November 15, 2021, the Tribal Court issued a minute order in response to the Tribal Court of Appeals' decision, lifting the stay on the Tribal Court Action.

67.    The Tribal Court Action remains ongoing, and the Tribal Court continues to exercise jurisdiction over Lexington.

## V.    GENERAL ALLEGATIONS AND LEGAL AUTHORITIES

68.    Under Supreme Court and other federal precedent, the Tribal Court does not have authority to exercise jurisdiction over Lexington, and the Tribal Court's ongoing exercise of tribal jurisdiction over Lexington is unlawful.

**A.    The Presumption Against Tribal Jurisdiction Over Lexington**

69.    Indian "tribes do not, as a general matter, possess authority over non-Indians who come within their borders." *Plains Commerce Bank*, 554 U.S. at 328.  Thus, the exercise of jurisdiction by a tribal court over a nonmember is "presumptively invalid." *Id.* at 330 (citing *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 659 (2001)).

70.    This general rule against tribal jurisdiction over nonmembers derives from the historically "unique and limited character" of tribal sovereignty.  *United States v. Cooley*, 141 S. Ct. 1638, 1642 (2021).  When tribes were incorporated into the United States, they became "dependent" sovereigns and "lost many of the attributes of sovereignty." *Montana*, 450 U.S. at 563–64.  Among those lost attributes was the ability

1    to freely and independently determine their external relations with nonmembers.  *See*

2    *Cooley*, 141 S. Ct. at 1642–43 (citing *United States v. Wheeler*, 435 U.S. 313, 326

3    (1978)); *see also Plains Commerce Bank*, 554 U.S. at 328 ("This general rule restricts

4    tribal authority over nonmember activities taking place on the reservation").  Indeed, the

5    Supreme Court has explained that "the inherent sovereign powers of an Indian tribe do

6    not extend to the activities of nonmembers of the tribe."  *Montana*, 450 U.S. at 564–65.

7    　　　　71.　　Lexington is a nonmember of the Tribe and has no say in the laws and

8    regulations that govern the Tribe and the Tribe's lands and members.

9    　　　　72.　　Because Lexington is a nonmember of the Tribe, the Tribal Court's exercise

10   of jurisdiction over it is presumptively invalid.

11   **B.**　　**The *Montana* Exceptions**

12   　　　　73.　　In *Montana*, the Supreme Court recognized only two narrow exceptions to

13   the general rule against tribal jurisdiction over nonmembers.  First, a tribe "may regulate,

14   through taxation, licensing, or other means, the activities of nonmembers who enter

15   consensual relationships with the tribe or its members, through commercial dealing,

16   contracts, leases, or other arrangements."  *Montana*, 450 U.S. at 565.  Second, a tribe

17   may "exercise civil authority over the conduct of non-Indians on fee lands within its

18   reservations when that conduct threatens or has some direct effect on the political

19   integrity, the economic security, or the health or welfare of the tribe."  *Id.* at 566.

20   　　　　74.　　The Supreme Court has explained that the *Montana* exceptions are

21   "limited" and must not be construed in a manner that would "swallow the rule" or

22   "severely shrink it."  *Cooley*, 141 S. Ct. at 1645 (citation omitted); *Plains Commerce*

23   *Bank*, 554 U.S. at 330 (citations omitted).  Indeed, with "one minor exception, [the

24   Supreme Court has] never upheld under Montana the extension of tribal civil authority

25   over nonmembers on non-Indian land."  *Hicks*, 533 U.S. at 359–60.

26   　　　　75.　　Moreover, the "burden rests on the tribe to establish one of the exceptions

27   to Montana's general rule that would allow an extension of tribal authority to regulate

28   nonmembers."  *Plains Commerce Bank*, 554 U.S. at 330.

76.     The Tribe has not met and cannot meet this heavy burden.

1.     **The First *Montana* Exception Does Not Apply**

77.     The Tribal Court of Appeals held that the first *Montana* exception permits the exercise of tribal jurisdiction over Lexington in the Tribal Court Action.

78.     The Tribal Court of Appeals, however, misapplied the first *Montana* exception and expanded the reach of the Tribe's authority in violation of federal law.

79.     The first *Montana* exception permits the exercise of tribal jurisdiction over the "activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565.

80.     The Supreme Court has explained that "*Montana*'s list of cases fitting within the first exception indicates the type of activities the Court had in mind." *Strate v. A-1 Contractors*, 520 U.S. 438, 456–57 (1997).  Each of the cases on *Montana*'s list involves nonmember *activity on the land*, within the territorial boundaries of a tribe.  *See id.* at 446 ("*Montana* thus described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation . . . .").

81.     The first case cited by *Montana* was *Williams v. Lee*, 358 U.S. 217 (1959). *Williams* concerned a payment dispute between tribal customers and a nonmember's general store on tribal land.  *Id.* at 217–18.  Tribal jurisdiction was affirmed because the nonmember business owner "was on the reservation and the transaction with an Indian took place there."  *Id.* at 223.  The remaining three cases cited by *Montana* concerned the taxation of businesses owned and operated by nonmembers on tribal lands.  *See Morris v. Hitchcock*, 194 U.S. 384, 390 (1904) (permit tax on nonmember-owned livestock within the territorial boundaries of a tribe); *Buster v. Wright*, 135 F. 947, 950 (8th Cir. 1905) (permit tax for nonmember trading posts within the territorial boundaries of a tribe); *Washington v. Confederated Tribes of Colville Reservation*, 447 U.S. 134, 152–54 (1980) (tax on cigarette sales to nonmembers within tribal reservation).

82.    In keeping with *Montana* (which was decided in 1981) and *Strate* (which was decided in 1997), the Supreme Court has since observed that its "*Montana* cases have *always* concerned nonmember conduct *on the land*." *Plains Commerce Bank*, 554 U.S. at 334 (emphases added).  Indeed, the Supreme Court has likewise explained that the "general rule" announced in *Montana* "restricts tribal authority over nonmember activities taking place *on the reservation*." *Id.* at 328 (emphasis added); *see also Cooley*, 141 S. Ct. at 1643 ("We have subsequently repeated *Montana*'s proposition and exceptions in several cases involving a tribe's jurisdiction over the activities of non-Indians within the reservation.").

83.    Allowing tribal jurisdiction over nonmember conduct "on the land" fits squarely within the territorial limits of tribal sovereignty, which the Supreme Court has explained "centers on the land held by the tribe." *Plains Commerce Bank*, 554 U.S. at 330; *see also* 533 U.S. at 392 ("tribes retain sovereign interests in activities that occur on land owned and controlled by the tribe").  As the Ninth Circuit has stated, "tribal jurisdiction is, of course cabined by geography:  The jurisdiction of tribal courts does not extend beyond tribal boundaries." *Philip Morris USA, Inc. v. King Mountain Tobacco Co.*, 569 F.3d 932, 938 (9th Cir. 2009).

84.    Other federal appellate courts have specifically observed that "*Montana* and its progeny permit tribal regulation of nonmember *conduct inside the reservation*." *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 782 (7th Cir. 2014) (citation omitted); *accord Hornell Brewing Co. v. Rosebud Sioux Tribal Ct.*, 133 F.3d 1087, 1091 (8th Cir. 1998) ("Neither *Montana* nor its progeny purports to allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring *outside their reservations*.").

85.    The Seventh Circuit, for example, has determined that *Montana*'s first exception does not apply to off-reservation conduct arising from contractual relationships between a nonmember and a tribe or its members.  In *Jackson*, nonmember consumers brought a putative class action against several loan companies owned by a

tribal member who resided on tribal land.  764 F.3d at 768.  The loan entities argued that the dispute had to be litigated not in federal court, but in tribal court, under the first *Montana* exception, because the nonmember consumers entered into loan agreements with entities owned by the tribal member through contracts that included forum-selection clauses requiring litigation to be conducted in tribal court.  *Id.* at 781–82.  The Seventh Circuit held that the tribal court could not exercise jurisdiction over the loan dispute, explaining that the plaintiffs had "not engaged in *any* activities inside the reservation.  They did not enter the reservation to apply for the loans, negotiate the loans, or execute the loan documents."  *Id.* at 782.  And "[b]ecause the Plaintiffs' activities d[id] not implicate the sovereignty of the tribe over its land and its concomitant authority to regulate the activity of nonmembers on the land, the tribal courts d[id] not have jurisdiction over Plaintiffs' claims."  *Id.*

86.    The Seventh Circuit reaffirmed this principle in *Stifel, Nicolaus & Co. v. Lac du Flambeau Band of Lake Superior Chippewa Indians*, 807 F.3d 184 (7th Cir. 2015), rejecting the argument of tribal defendants that "the court need not limit its consideration [of the first *Montana* exception] to the on-reservation actions of [nonmembers]."  *Id.* at 207.  The court had "made clear in *Jackson* . . . that *Plains Commerce Bank* 'circumscribed' the already narrow *Montana* exceptions" and "that a tribe's authority to regulate nonmember conduct 'centers on the land.'"  *Id.*  On this basis, the court upheld a preliminary injunction enjoining tribal judicial officials from pursuing further tribal-court proceedings, given that none of the nonmember conduct at issue occurred "on tribal land."  *Id.* at 207–09.

87.    The Tribal Court of Appeals rejected the argument that "physical presence [on tribal land] is a requirement" for tribal jurisdiction, in part because it found "no language in any Supreme Court opinion barring tribal jurisdiction over nonmembers who knowingly and purposefully conduct business activities with Indian tribes . . . from afar."  But there is such language.  In *Plains Commerce Bank*, the Supreme Court explained that *Montana* has "always" concerned nonmember conduct "on the land,"

within the territorial boundaries of a tribe.  554 U.S. at 334.  A nonmember's "physical presence" on tribal land is a requirement that inheres within the geographically limited nature of tribal jurisdiction and sovereignty.

88.    The first *Montana* exception does not apply here.

a. Lexington is a nonmember of the Tribe.

b. Although Lexington has a contractual insurance relationship with the Tribe, Lexington has not engaged in any activity related to those contracts on the Tribe's land or within the territorial boundaries of the Tribe.

c. All of Lexington's conduct relating to its insurance contract with the Tribe, including all review and consideration of the insurance claims at issue, occurred off tribal land.

d. The Tribal Court Action involves legal questions concerning the interpretation of contractual terms and provisions and so does not concern specific conduct by Lexington on tribal land.

e. Thus, the Tribal Court lacks the authority to exercise tribal jurisdiction over Lexington in the Tribal Court Action.

89.    Neither the Supreme Court nor any other federal appellate court has held that an insurance relationship with a tribe or its members is enough to establish tribal jurisdiction over a nonmember insurer.  *See, e.g.*, *Admiral Ins. Co. v. Blue Lake Rancheria Tribal Court*, 2012 WL 1144331, at *6 (N.D. Cal. Apr. 4, 2012) (expressing doubt as to a tribal court's jurisdiction over a nonmember based merely on an insurance contract).

90.    As discussed, where an insurer has not engaged in relevant activity on a Tribe's land, the first *Montana* exception does not apply.  *See Jackson*, 764 F.3d at 782; *Stifel*, 807 F.3d at 208; *see also, e.g.*, *Progressive Specialty Ins. Co. v. Burnette*, 489 F. Supp. 2d 955, 958 (D.S.D. 2007) (neither *Montana* exception applied to nonmember insurer that provided automobile insurance to tribal members, because the insurer "never

maintained an office or established any other physical presence on the reservation" and never "entered tribal lands or . . . [directly] conducted any business with the Tribe"); *Smith v. Western Sky Financial, LLC*, 168 F. Supp. 3d 778, 783 (E.D. Pa. 2016) (finding no tribal jurisdiction over a nonmember's activities under a loan agreement, all of which occurred "off of the reservation," even though "contracts formed over the Internet create ambiguity as to place"); *Hengle v. Asner*, 433 F. Supp. 3d 825, 862 (E.D. Va. 2020) (finding no "colorable" basis for tribal jurisdiction where nonmembers with loan agreements with tribal entities "obtained, negotiated and executed their loans from their residences in Virginia through websites maintained by companies in Kansas, far from the Tribe's reservation in California," and where the nonmembers "made loan payments from Virginia to payment processors operating out of Kansas").

## 2. The Second *Montana* Exception Also Does Not Apply

91.     The second *Montana* exception permits the exercise of tribal jurisdiction over a nonmember whose conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566.

92.     The Tribe has never asserted that this exception applies with regard to Lexington or the Tribal Court Action.  Likewise, the Tribal Court of Appeals did not consider or show whether the second *Montana* exception permits the exercise of tribal jurisdiction over Lexington in the Tribal Court Action.

93.     There is a reason the Tribe has never argued this point:  The second *Montana* exception does not permit the exercise of tribal jurisdiction over Lexington.

94.     The second *Montana* exception has a particularly "elevated threshold." *Plains Commerce Bank*, 554 U.S. at 341.  The challenged conduct "must do more than injure the tribe, it must 'imperil the subsistence' of the tribal community," and the exercise of tribal jurisdiction over that conduct must be "necessary to avert catastrophic consequences." *Id.* (citations omitted).

Gibson, Dunn & Crutcher LLP

95.     The elevated threshold of the second *Montana* exception has not been met here.

a.  None of the nonmember conduct at issue in the Tribal Court Action threatens or has a direct effect on the political integrity, the economic security, or the health or welfare of the Tribe.

b.  None of the nonmember conduct at issue in the Tribal Court Action imperils the subsistence of the Tribe's community.

c.  The Tribal Court's exercise of jurisdiction in the Tribal Court Action is not necessary to avert catastrophic consequences, and the Tribe has provided no evidence of such consequences.

**3.     The Exercise of Tribal Jurisdiction Does Not Stem from the Tribe's Inherent Sovereign Authority**

96.     As a threshold matter, for either *Montana* exception to apply, a tribe's exercise of jurisdiction "must stem from [its] inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations." *Plains Commerce Bank*, 554 U.S. at 336-37.  The Tribe's exercise of tribal jurisdiction here does not stem from such inherent sovereign authority.

97.     As the Supreme Court explained in *Plains Commerce Bank*, nonmember "activities or land uses may be regulated" only to the extent they "intrude on the internal relations of the tribe or threaten self-rule." *Id.* at 334–35.  This is because "certain forms of nonmember behavior . . . may sufficiently affect the tribe as to justify tribal oversight," even though "tribes generally have no interest in regulating the conduct of nonmembers." *Id.*  In other words, tribes "may regulate nonmember behavior that implicates tribal governance and internal relations." *Id.*

98.     Indeed, this requirement is stated in *Montana* itself:  The "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes." *Montana*, 450 U.S. at 564.

99.     Thus, if the exercise of tribal jurisdiction over a nonmember "cannot be justified by reference to the tribe's sovereign interests," it is invalid.  *Plains Commerce Bank*, 554 U.S. at 335; *see also Strate*, 520 U.S. at 459 (the *Montana* exceptions apply only where tribal adjudicatory or regulatory authority "is needed to preserve the right of reservation Indians to make their own laws and be ruled by them").

100.    The Supreme Court and several federal courts of appeals have expressly applied this threshold requirement in deciding there is no tribal jurisdiction.

a.  *Plains Commerce Bank*, 554 U.S. at 336–37:  The Supreme Court found that a tribal court lacked jurisdiction over a dispute involving the sale of non-Indian fee land by a nonmember bank.  The Court explained that regulating the sale of non-Indian fee land could not be justified by the tribe's sovereign interests of "protecting internal relations and self-government," because the "mere fact of resale" had not threatened those interests.  Certain "*uses* to which land is put" by a nonmember very well could implicate sovereign interests, but no such use of land was at issue, and the tribe therefore lacked authority over the sale.

b.  *Jackson*, 764 F.3d at 783 :  The Seventh Circuit rejected the argument that "a nonmember's consent to tribal authority" was "sufficient to establish the jurisdiction of a tribal court," because the tribal court's jurisdiction over nonmembers must also "stem from the tribe's inherent sovereign authority."   And the dispute at issue, concerning off-reservation loan activity, did not implicate "*any* aspect of 'the tribe's inherent sovereign authority.'"

c.  *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1138 (8th Cir. 2019):  The Eighth Circuit decided that a tribal court lacked jurisdiction over nonmember oil and gas companies accused of failing to pay royalties under leases with various tribal members.  The Eighth Circuit explained that although the leases were "consensual relationships with

tribal members," a "consensual relationship alone is not enough" to establish tribal jurisdiction.  The exercise of tribal jurisdiction had to stem from the tribe's sovereign interests, and the regulation of nonmember companies and their lease-related activity was "not necessary for tribal self-government or controlling internal relations."

d.  *NLRB v. Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d 537, 546 (6th Cir. 2015):  The Sixth Circuit held that the National Labor Relations Board had authority to regulate the labor-organizing activity of a tribe's casino employees and to prevent the tribe's enforcement of conflicting tribal laws, because imposing federal labor laws on the tribe did not interfere with the tribe's self-governance.  The court reviewed "the law governing implicit divestiture of tribal sovereignty" and concluded that in *Montana*, *Hicks*, and *Plains Commerce Bank*, the Supreme Court has repeatedly made clear that a tribe's "power to regulate the activities of non-members is constrained, extending only so far as 'necessary to protect tribal self-government or to control internal relations'" and that "[t]ribal regulations of non-member activities must 'flow directly from these limited sovereign interests.'"  The Sixth Circuit determined that labor regulations concerning tribal and non-tribal casino employees did not sufficiently implicate those interests.

101.   The exercise of tribal jurisdiction over Lexington in the Tribal Court Action is not necessary to protect tribal self-government or to control internal relations.

102.   The Tribal Court Action concerns the interpretation of contractual terms and conditions that implicate nonmember conduct occurring solely off the Tribe's land, outside the Tribe's territorial boundaries.  Thus, the exercise of tribal jurisdiction over Lexington's conduct under the contract does not implicate or stem from the Tribe's "sovereign interests in activities that occur *on land* owned and controlled by the tribe." *Hicks*, 533 U.S. at 392 (emphasis added); *Plains Commerce Bank*, 554 U.S. at 327 (tribal

sovereignty "centers on the land held by the tribe and on non-tribal members within the reservation"); *see, e.g.*, *Stifel*, 807 F.3d at 207 ("The actions of nonmembers outside of the reservation do not implicate the Tribe's sovereignty.").

103.   As part of its analysis of the first *Montana* exception, the Tribal Court of Appeals relied on and found instructive the reference in *Plains Commerce* to *Williams v. Lee*, 358 U.S. 217 (1959).  554 U.S. at 332.  According to the Tribal Court of Appeals, *Williams* established that "contractual disputes are 'reservation affairs,'" over which tribal jurisdiction is "necessary in order for Indians to be able to make their own laws and be ruled by them."  But the Tribal Court of Appeals misread the holding in *Williams*. The Supreme Court did not hold that *all* contractual disputes (regardless of whether they occurred on or off tribal lands) automatically constitute "reservation affairs" for which tribal jurisdiction is necessary.

104.   Instead, *Williams* affirms the territorial limits of tribal sovereignty. *Williams* concerned a tribal court's jurisdiction over a contract dispute arising from the sale of merchandise by a nonmember to a *tribal member on tribal land*.  *Id.*  The Supreme Court held tribal jurisdiction was proper because the nonmember was "*on the Reservation* and the transaction with the Indian *took place there*."  *Williams v. Lee*, 385 U.S. at 223 (emphases added).  Put differently, tribal jurisdiction was proper because *Williams* involved a tribe's inherent sovereign authority over internal reservation affairs. The transaction at issue in *Williams* was (1) with a tribal member, (2) occurred on tribal land at a store, and (3) the underlying suit involved a tribal defendant, and therefore implicated tribal laws governing tribal members and reservation affairs.  No similar facts are present here.

105.   If further confirmation were needed that this case does not implicate tribal sovereignty, it can be found in the fact that the Tribe does not regulate insurance in the first place.  By comparison, in the State of California, the authority to set insurance policy and regulate insurance is vested in the California Department of Insurance and Insurance Commissioner, whose duties include rulemaking, investigation, emergency

regulations, and oversight of a broad range of insurance matters. *See, e.g.*, Cal. Ins. Code §§ 12919–13555; *see also* 15 U.S.C. § 1011 ("Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that the silence on the part of Congress shall not be construed as to impose any barrier to the regulation or taxation of such business by the several States"). The absence of insurance regulation by the Tribe indicates that the exercise of jurisdiction by the Tribal Court over Lexington's conduct under the insurance policy has never been necessary to protect tribal self-government or to control internal tribal relations. A state or federal court of competent jurisdiction can just as easily decide the contractual dispute at issue here—without endangering or compromising the Tribe's sovereignty. *See Kodiak Oil*, 932 F.3d at 1138 (rejecting application of first *Montana* exception where "complete federal control of oil and gas leases on allotted lands—and the corresponding lack of any role for tribal law or tribal government in that process— undermine[d] any notion that tribal regulation in this area [was] necessary for tribal self-government").

106.   The absence of insurance regulation by the Tribe is significant also because "a tribe's adjudicative jurisdiction [can]not exceed its legislative jurisdiction." *Strate*, 520 U.S. at 453; *see also Plains Commerce Bank*, 554 U.S. at 330 ("reaffirm[ing]" the principle that tribal courts lack jurisdiction to hear claims exceeding the bonds of a tribe's "legislative jurisdiction"). Because the Tribe does not regulate insurance and has not been granted regulatory authority by Congress over any aspect of the insurance industry, the Tribal Court cannot exercise adjudicative jurisdiction over Plaintiff's insurance activity. *See Jackson*, 764 F.3d at 783 ("[I]f a tribe does not have the authority to regulate an activity, the tribal court similarly lacks jurisdiction to hear a claim based on that activity.").

107.   The Tribal Court of Appeals reasoned that the contract dispute at issue in the Tribal Court Action implicated the Tribe's inherent sovereign authority because the insurance contract "insur[ed] [the Tribe's] most important source of tribal revenues . . .

necessary to fund programs essential to tribal self-government." But such economic effects do not meet the "elevated threshold" for *Montana*'s second exception, which requires that conduct "do more than injure the tribe." *Plains Commerce Bank*, 554 U.S. at 341 (explaining that the second *Montana* exception concerns conduct that "imperil[s] the subsistence' of the tribal community"). Indeed, the Seventh Circuit considered and rejected a similar argument, explaining that to find that the second *Montana* exception applies "whenever the economic effects of [a tribe's] commercial agreements affect a tribe's ability to provide services to its members" would render the second exception "so broad, [that] it would swallow the rule." *Stifel*, 807 F.3d at 209.

### 4.   The Exercise of Tribal Jurisdiction Over Lexington Swallows the General Rule Against Tribal Jurisdiction Over Nonmembers

108.   The *Montana* exceptions "cannot be construed in a manner that would swallow the rule" against tribal jurisdiction over nonmembers. *Cooley*, 141 S. Ct. at 1645 (citing *Plains Commerce Bank*, 554 U.S. at 330). The exercise of tribal jurisdiction over Lexington, however, does just that.

109.   By permitting the exercise of tribal jurisdiction over Lexington, the Tribal Court of Appeals has construed the first *Montana* exception in a way that allows the Tribe authority over nonmembers based solely on the existence of a contractual relationship with the Tribe relating to Reservation property, without accounting for the additional limiting requirements that the nonmember's relevant conduct occur *on the land* held by the Tribe and that the exercise of tribal jurisdiction be justified by reference to the Tribe's *sovereign interests*. This construction of the first *Montana* exception is untenable.

a.   It allows the Tribe to exercise jurisdiction over every nonmember it contracts with, regardless of whether the nonmember's relevant conduct actually takes place on the Tribe's land or implicates tribal self-government and internal relations.

Gibson, Dunn & Crutcher LLP

b.  It allows the Tribe to regulate the terms of its "consensual relationships" with nonmembers, even though the first *Montana* exception is confined to regulating nonmember *conduct* on the land that implicates a tribe's sovereign interests rather than the consensual relationships themselves.

c.  It provides the Tribe with adjudicatory and regulatory authority over every contract the Tribe enters into with nonmembers, as if contracting with the Tribe were equivalent to physically entering and acting on the Tribe's lands.

## C.   The Right to Exclude Does Not Apply

110.   The Ninth Circuit allows tribal jurisdiction over nonmembers based not just on the two narrow *Montana* exceptions, but also the "right to exclude" doctrine.  *Water Wheel Camp Rec. Area, Inc. v. LaRance*, 642 F.3d 802, 804–05 (9th Cir. 2011) (per curiam).  Under that doctrine, a tribe's "sovereign authority over tribal land" provides it with the power to exclude nonmembers from the land, a power which "necessarily includes the lesser authority to set conditions on their entry through regulations."  *Id.* at 811.  The Supreme Court has not recognized the right-to-exclude doctrine as a basis for tribal jurisdiction separate and apart from *Montana*.  But under current Ninth Circuit law, it applies independently from *Montana*:  A tribe's power to exclude applies to nonmembers on "tribal land," whereas a tribe's powers under *Montana* apply to nonmembers on "non-Indian fee land," which is land held in fee simple by a nonmember.  *Id.* at 812.

111.   The Tribal Court of Appeals decided that the right-to-exclude doctrine here permits the exercise of tribal jurisdiction over Lexington, because the Lexington "definitively conducts business on Cabazon lands by insuring Cabazon property located on . . . Cabazon lands," and "setting foot' on the reservation can involve more than a mere physical presence in this era of long-distance business activities."

112.   The Tribal Court of Appeals incorrectly applied the right-to-exclude doctrine, which does not permit the exercise of tribal jurisdiction under these

circumstances.  Similar to the first *Montana* exception, for the "right to exclude" to apply, a nonmember must physically enter tribal land, and the nonmember's physical presence on the land must be at issue and implicate the tribe's ability to manage its lands.

    a.  *Water Wheel*, 642 F.3d at 814:  The Ninth Circuit affirmed a tribe's regulatory jurisdiction over a nonmember based on the right-to-exclude doctrine, "where the non-Indian activity in question occurred *on tribal land*" and "the activity interfered directly with the tribe's inherent powers to exclude and manage its own lands."

    b.  *Knighton v. Cedarville Rancheria of Northern Paiute Indians*, 922 F.3d 892, 901 (9th Cir. 2019):  The Ninth Circuit held that a tribe had "authority to regulate [a nonmember employee's] conduct on tribal land pursuant to its sovereign exclusionary powers," given that the nonmember's "alleged conduct violated the [t]ribe's regulations that were in place at the time of her employment," while she was "on tribal land."

    c.  *Grand Canyon Skywalk Development v. 'SA' Nyu Wa Inc.*, 715 F.3d 1196, 1204–05 (9th Cir. 2019):  The Ninth Circuit found tribal jurisdiction "not plainly lacking" with regard to a non-tribal corporation that entered into an agreement with a tribal corporation to build and manage a tourist destination on tribal land.  Because the "essential basis for the agreement" was "access to" tribal land and the contract "interfered with the [tribe's] ability to exclude [the non-tribal corporation] from the reservation," the tribe likely had regulatory and adjudicatory authority over the parties, lands, and interests implicated by the agreement.

113.  When a nonmember has *not* physically entered the tribal land and has *not* engaged in activity on tribal land, the "right to exclude" does not apply.  *See Emp'rs Mut. Cas. Co. v. McPaul*, 804 F. App'x 756, 757 (9th Cir. 2020).  In *McPaul*, the Ninth

Circuit held that because a nonmember's insurance company's "relevant conduct—negotiating and issuing general liability insurance contracts to non-Navajo entities—occurred entirely outside of tribal land," a tribal court's jurisdiction could not be premised on the tribe's right to exclude. *Id.* As the district court in *McPaul* elaborated, the nonmember insurer "never set foot on reservation land, interacted with tribal members, or expressly directed any activity within the reservation's borders." *Emp'rs Mut. Cas Co. v. Branch*, 381 F. Supp. 3d 1144, 1149–50 (D. Ariz. 2019), *aff'd sub nom. McPaul* 804 F. App'x 756.

2. The Tribe's right to exclude does not apply to Lexington and therefore does not permit the exercise of tribal jurisdiction over Lexington.

   a. Lexington has not entered into, sent employees to, maintained operations within, trespassed, or engaged in any activity on the Tribe's land or within the territorial borders of the Tribe.

   b. The insurance contract at issue does not provide Lexington with access to the Tribe's land, nor does it contain terms that affect or impair the Tribe's ability to exclude individuals from its land.

114. As part of its analysis of the "right to exclude" doctrine, the Tribal Court of Appeals found persuasive the Tribe's argument that it "could bar Lexington from insuring any and all tribal property, or alternatively, limit the types of tribal property to be insured or the amounts of such coverage." But this proposition conflates commercial discretion with sovereign authority. What the Tribe may or may not be able to do as a private party deciding the terms of a business relationship must not be confused with what it is (narrowly) permitted to do as a tribal sovereign seeking to impose its authority on a nonmember. *See San Manuel Indian Bingo and Casino v. NLRB*, 475 F.3d 1306, 1312–13 (D.C. Cir. 2007) ("[T]ribal sovereignty is not absolute, permitting a tribe to operate in a commercial capacity without legal constraint."). Indeed, the Supreme Court has cautioned against "confus[ing] the Tribe's role as commercial partner with its role as sovereign" in this manner. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146

(1982); *see also Montana*, 450 U.S. at 565–66 ("Indian tribes have lost any 'right of governing every person within their limits except themselves'" but can "exercise some forms of civil jurisdiction over non-Indians on their reservations").  When "a tribal government goes beyond matters of internal self-governance and enters into off-reservation business transaction[s] with non-Indians, its claim of sovereignty is at its weakest." *San Manuel*, 475 F.3d at 1313.

115.   Because Lexington has not entered the Tribe's land, there is nothing for the Tribes to exclude, and thus the "right to exclude" doctrine does not permit the exercise of tribal jurisdiction over Lexington in the Tribal Court Action.

## FIRST CAUSE OF ACTION

### (Declaratory Relief)

116.   Plaintiff re-alleges and incorporates by reference each of the allegations above.

117.   An actual and justiciable controversy exists between Plaintiff and Defendants concerning the ongoing exercise of jurisdiction by the Tribal Court over Plaintiff and the claims brought against it in the Tribal Court Action.  A declaration by this Court as to the Tribal Court's jurisdiction would terminate the controversy giving rise to this cause of action.

118.   Plaintiff is entitled to judgment from this Court declaring that the Tribal Court lacks jurisdiction over it and the claims brought against Plaintiff in the Tribal Court and that the ongoing exercise of such jurisdiction violates federal law.

## SECOND CAUSE OF ACTION

### (Injunctive Relief)

119.   Plaintiff re-alleges and incorporates by reference each of the allegations above.

120.   The Tribal Court has exercised and will continue to exercise jurisdiction over Plaintiff and the claims brought against it in the Tribal Court Action.

Gibson, Dunn &
Crutcher LLP

121.   The ongoing exercise of jurisdiction by the Tribal Court over Plaintiff and the claims brought against it in the Tribal Court Action is unlawful.

122.   Because of the ongoing and unlawful exercise of jurisdiction by the Tribal Court over Plaintiff and the claims brought against it in the Tribal Court Action, Plaintiff faces irreparable injury for which no adequate legal remedy exists.

   a.   Plaintiff has been and imminently will be subject to the orders and judgments of a court that lacks jurisdiction over Plaintiff and the claims at issue.

   b.   Plaintiff has been and imminently will be forced to expend unnecessary and unreasonable time, effort, and expense by litigating the Tribal Court Action before a court that lacks jurisdiction over Plaintiff and the claims at issue.

123.   The irreparable harm to Plaintiff in the absence of injunctive relief outweighs any hardships to Defendants.

124.   An injunction against further proceedings involving Plaintiff in the Tribal Court Action will serve the public interest in ensuring the proper allocation of jurisdiction and authority between federal, state, and tribal courts.

125.   Plaintiff is entitled to an injunction against further proceedings involving Plaintiff in the Tribal Court Action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lexington Insurance Company prays for the following relief:

A.   A declaration pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure Rule 57 that the Cabazon Reservation Court lacks jurisdiction over Lexington and the claims brought against Lexington in *Cabazon Band of Mission Indians v. Lexington Insurance Co.*, Case No. 2020-0103, and that the Cabazon Reservation Court's ongoing exercise of jurisdiction over Lexington and the aforementioned claims violates federal law;

B.     A preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining Defendants, their agents, employees, successors, and assigns from engaging in further proceedings involving Lexington before the Cabazon Reservation Court in *Cabazon Band of Mission Indians v. Lexington Insurance Co.*, Case No. 2020-0103;

C.     For a permanent injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining Defendants, their agents, employees, successors, and assigns from engaging in further proceedings involving Lexington before the Cabazon Reservation Court in *Cabazon Band of Mission Indians v. Lexington Insurance Co.*, Case No. 2020-0103.

D.     An award of costs, fees, and other disbursements allowed by law, including but not limited to attorneys' fees; and

E.     Such other relief as may be just and proper.

## VI.     JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 5, 2022

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ _____
                    Richard J. Doren

Attorneys for Plaintiff LEXINGTON INSURANCE COMPANY

Gibson, Dunn & Crutcher LLP